IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

| | |
|---|---|
| EDWARD LEE COMER,<br><br>        Plaintiff,<br><br>vs.<br><br>NICK MYERS, in his individual capacity as Study Abroad Coordinator for the Office of International Programs at Montana State University; GLENN PUFFER, in his individual capacity as Assistant Dean of Students at Montana State University,<br><br>        Defendants. | CV-06-65-BU-RFC-CSO<br><br>**<u>FINDINGS AND RECOMMENDATIONS ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>** |

Plaintiff Edward Lee Comer ("Comer") filed this action seeking damages for alleged violation of his federal civil rights and for related state law claims. Now pending before the Court is Defendants' Motion for Summary Judgment, which has been fully briefed. On February 26, 2007, this matter was referred to the undersigned. Having reviewed the parties' arguments and the applicable law, the following findings and recommendations are entered.

## I. BACKGROUND

As a sophomore at Montana State University ("MSU"), Comer enrolled in a program offered by MSU's Office of International Programs ("OIP") at Lancaster University ("Lancaster") in England for study abroad in September 2003. He enrolled in 16 units of courses at Lancaster for the 2004 Lent (spring) and summer terms, covering the period from January through June 2004. *Complaint* ("Complt.") at 3, ¶ 7.[1]

Prior to leaving the United States, Comer informed defendant Nick Myers ("Myers"), OIP Study Abroad Coordinator, that he would be leaving Lancaster prior to June 2004 to attend his sister's wedding. He also communicated this intention to the Lancaster housing authorities and contends that he did not commit to paying rent for Lancaster's summer term. He claims that he made arrangements with all of his professors at Lancaster to complete and submit the course work in a manner that permitted him to leave Lancaster prior to the end of the summer term. *Id.* ¶ 8.

On or around May 14, 2004, Comer met with Myers at MSU and informed Myers that he left Lancaster early, after making suitable arrangements with his Lancaster professors. During

---

[1] As set forth *infra*, the Court, in reviewing this motion, must draw all reasonable inferences in favor of Comer as the non-moving party. Accordingly, the following background is taken from the complaint unless otherwise stated.

that same time period, OIP approved Comer for study abroad at Yeditepe University in Istanbul, Turkey. Comer completed the necessary forms and the MSU Registrar enrolled Comer at Yeditepe for the summer 2004 term. *Id. at 4, ¶¶ 10-12.* The MSU Registrar, Charles Nelson ("Nelson"), states that Myers "initiated the process" for the Registrar's office to show study abroad by Comer for the 2004 summer term, but that he was never personally informed that Comer's application had been accepted by Yeditepe University. *Nelson Aff. at 3, ¶ 4.*

Comer arrived in Turkey on or about June 3, 2004. On June 4, 2004, Myers received an email from Sylvia Ratcliffe of Lancaster informing Myers that Comer had left the university before finishing exams and that Comer owed rent at his residence hall. Ratcliffe's email also indicated that Lancaster's "student registry is too busy to check out who has attended." *Complt. at Exh. 4.* Myers immediately put in motion efforts to remove Comer from MSU's summer registration and to revoke his financial aid. *Id.* Myers sent Comer an email informing him that OIP was "rescinding it's (sic) support of [Comer's] participation in the summer 2004 session at Yeditepe", that his registration and financial aid for the term would not be processed further, and that a hold was placed on all Comer's MSU records. *Id. at 5, ¶¶ 15-17.* The same day, Myers informed Yeditepe University that Comer no longer had OIP's approval to

participate in Yeditepe's 2004 summer session. He also sent emails to Defendant Glenn Puffer ("Puffer"), MSU Assistant Dean of Students, and to Brandi Payne ("Payne"), MSU Director of Financial Aid, to effect the revocation of financial aid and MSU's removal of Comer from summer registration at MSU. *Id. at Exhs. 2, 4, 5 and 6.* On June 15, 2004, Puffer signed a form withdrawing Comer from MSU, effectively suspending Comer for the summer 2004 term. Myers and Puffer also placed a hold on Comer's records and terminated his financial aid. *Id. at 6, ¶ 18.*

Nelson indicates that "[a]n alternative would have been to wait until after the summer session at Yeditepe University in Turkey had begun, and then to have requested confirmation regarding enrollment, and, if Mr. Comer was not enrolled, then to have processed Mr. Comer's administrative disenrollment." *Nelson Aff. at ¶ 5.* Because Myers had already determined that Comer was ineligible to participate in an OIP program, however, no basis existed for MSU's summer "placeholder" enrollment and Nelson advised Puffer to process a University Withdrawal Form on Mr. Comer. *Id.* That form is customarily completed by the students.

On July 6, 2004, Puffer advised Comer that disciplinary action would not be pursued and that any grievance had to be pursued through MSU's Provost's office. Comer filed a grievance

-4-

and pursued appeals, all of which were denied.

## II. PARTIES' ARGUMENTS

In their Motion for Summary Judgment, Defendants argue that they did not violate Comer's constitutional rights to due process, and that qualified immunity bars Comer's claims under 42 U.S.C. § 1983. Regarding the state claims, they argue that they were not negligent, did not engage in a civil conspiracy and that Comer's defamation claim is barred by the statute of limitations and privilege. In support of their motion, they present the affidavits of Myers, Puffer, Nelson, and Payne, along with selected underlying documents. Comer responds that there are genuine issues of material fact that preclude summary judgment.

## III. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable trier of fact to return a verdict for the nonmoving party. Id.

The party moving for summary judgment bears the initial

burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Celotex Corp., 477 U.S. at 323.

The evidence must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).

## IV. ANALYSIS

### A. Count I: Section 1983 Claims

#### 1. Property interests claims in transcript and continued enrollment

Comer alleges three separate section 1983 claims: (a) deprivation without due process of property right in OIP participation; (b) deprivation without due process of property interest in transcript; and (c) deprivation without due process of property right by defacto suspension of plaintiff from MSU for the summer 2004 term. Defendants argue that Comer did not have a property interest in his transcript, in OIP participation, or in MSU enrollment.

With respect to the transcript, Defendants' arguments are persuasive. The Ninth Circuit has held that a student does not have a property interest in the official transcript. Juras v. Aman Collection Service, Inc., 829 F.2d 739, 742-43 (9th Cir. 1987). Comer argues only that M.C.A. § 20-25-515 creates a student's property right in a transcript. That statute provides: "A university or college shall release a student's academic record only when requested by the student or by a subpoena issued by a court.... A student's written permission must be obtained before the university or college may release any other kind of record unless such record shall have been subpoenaed by a court...." This section, however, only governs

release of the transcript and says nothing about a student's property interest in the transcript that is applicable in a dispute with the university. In any event, the transcript is maintained and held by the university itself. MSU will remove the hold on Comer's transcript after he pays his debt to MSU. Then MSU will release the transcript. *Nelson Aff.* at ¶ 7. Summary judgment is appropriate on this claim.

Comer's other two property interest claims are closely related. Both concern whether Comer had a property interest in his continued education through MSU for the 2004 summer term. Over twenty-five years ago, the United States Supreme Court held that disciplinary suspensions of students from public high schools without a hearing violated due process. See Goss v. Lopez, 419 U.S. 565, 576 (1975). The Supreme Court has not, however, extended this holding to higher education. In several cases, the Court has assumed that a college/university student has a property right in continued studies, without explicitly so holding.

In Regents of University of Michigan v. Ewing, 474 U.S. 214 (1985), the Supreme Court assumed, without deciding, that a student had a constitutional property interest in continued enrollment. The Court noted that lower courts had reasoned:

> In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), this Court held that property interests protected by due process are "defined by existing rules or understandings that stem from an

-8-

> independent source such as state law." See *Goss v. Lopez,* 419 U.S. 565, 572-573, 95 S.Ct. 729, 735-736, 42 L.Ed.2d 725 (1975). In a companion case, *Perry v. Sindermann,* 408 U.S. 593, 601-602, 92 S.Ct. 2694, 2699-2700, 33 L.Ed.2d 570 (1972), we held that "agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances' " could be independent sources of property interests. See *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (implied contracts). According to an antiquated race discrimination decision of the Michigan Supreme Court (whose principal holding has since been overtaken by events), "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom." *Booker v. Grand Rapids Medical College,* 156 Mich. 95, 99-100, 120 N.W. 589, 591 (1909).

Id. at 222, n.7.

The Sixth Circuit has held that the Due Process Clause is implicated by higher education disciplinary decisions. Flaim v. Medical College of Ohio, 418 F.3d 629, 633-34 (6th Cir. 2005). The First and Fourth Circuits have reached a similar result. Gorman v. University of Rhode Island, 837 F.2d 7, 9 (1st Cir. 1988) ("a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process"); see also Tellefsen v. University of North Carolina at Greensboro, 877 F.2d 60 (4th Cir. 1989) (adopting Gorman rule). The question remains open, however, in the Seventh Circuit. See Osteen v. Henley, 13 F.3d 221, 223 (7th Cir. 1993).[2]

---

[2]The question appears also to remain open in the Ninth Circuit, which apparently has no published decisions that address the issue. There exist, however, unpublished opinions that suggest the issue is open. See, e.g., Moore v. Parks,141 F.3d 1177 (9th Cir. 1998)

In Board of Curators of the Univ. Of Missouri v. Horowitz, 435 U.S. 78, 90 (1978), the Supreme Court drew a distinction between academic dismissals and disciplinary dismissals or suspensions, holding that less process is required for an academic suspension. Defendants here seek to characterize the decisions to withdraw OIP support for Yeditepe University and to withdraw Comer from MSU enrollment as academic decisions. Although there may have been academic considerations, it appears that the decisions were primarily disciplinary.

For example, Myers wrote a memo to Puffer on June 4, 2004, stating that OIP was "filing a complaint against" Comer and requesting on behalf of OIP that Comer be withdrawn from the university for the summer 2004 session. Comer Aff. at Exh. 2. The same day Myers wrote an email to Puffer stating that Comer "lied to both his host institution and to our office" and asking to "remove him from summer registration and revoke his financial aid." In another June 4 email, addressed to Brandi Payne, then Associate Director of Financial Aid, Myers again stated that OIP would "file a complaint" against Comer. Id. at Exh. 7. In a June 18, 2004, letter to Comer, Puffer alleged that Comer's actions "may constitute violations of the MSU Student Conduct

---

(unpublished) (assuming for purposes of holding that student had a property right in continued nursing studies); August v. Los Angeles Community College Dist. Bd. Of Trustees, 848 F.2d 1242 (9th Cir. 1988) (unpublished) (assuming, without deciding, that student had constitutionally protected liberty interest).

Code under the provisions for failure to comply with published university policies and theft of services." *Id.* at Exh. 11. Myers himself made clear that his decision had more to do with discipline than academics when he stated in an email to Puffer on June 18 that "this has much less to do with grades and whether Comer did or did not complete the courses, than with a pattern of intentional deception and unacceptable behavior on the part of the student...." *Id.* at Exh. 12.

Based on the foregoing, the Court cannot conclude that Defendants' withdrawal of support for Comer's attendance at Yeditepe University and their withdrawal of Comer from the MSU 2004 summer session were purely academic decisions.

State law also could be construed to give Comer property rights in continued enrollment. Comer alleges facts from which an implied agreement could arise. Further, in Montana State Univ. v. Ransier, 536 P.2d 187, 190 (Mont. 1975), the court held that, in the context of campus traffic violations, the student must be given oral or written notice of the charges against him and an opportunity to present his side of the story.

The MSU Student Conduct Code also provides due process safeguards for students accused of similar misconduct. Section 632.00 prohibits "Acts of Dishonesty" including "knowingly furnishing false information to any University official." Section 638 prohibits theft and misuse of property. This is the

-11-

type of conduct Myers accused Comers of committing. Sections 650.00 et seq. provide detailed procedures for conducting hearings concerning these types of allegations.

Accordingly, this court will follow the lead of other courts and assume, only for the purposes of reaching the qualified immunity analysis below, that Comer, having been approved for OIP participation and enrolled in the MSU summer session, had a property interest in continued enrollment.

After determining that Comer may have had a property interest, the next question is what process is due. Defendants' motion did not address what process was due, however. They sought summary judgment only on the question whether Comer had a protected property interest. Summary judgment on that issue is denied.

### 2. Qualified Immunity

Defendants assert that they are entitled to qualified immunity, contending that even if Comer had a property right, it would not be clear to a reasonable officer that his conduct violated Comer's right. Comer contends that the qualified immunity claim is without merit and should be denied.

Qualified immunity "protects § 1983 defendants from liability for civil damages when performing discretionary functions, unless such conduct violates a clearly established constitutional or statutory right of which a reasonable person

-12-

would have known." Jackson v. City of Bremerton, 268 F.3d 646, 650-51 (9th Cir. 2001) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Qualified immunity provides a protection to government officials that is quite far-reaching. "[I]t safeguards 'all but the plainly incompetent or those who knowingly violate the law. . . . [I]f officers of reasonable competence could disagree on th[e] issue [whether a chosen course of action is constitutional], immunity should be recognized." Brewster v. Bd. of Educ. of Lynwood Unified School Dist., 149 F.3d 971, 977 (9th Cir. 1998) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an immunity from suit rather than a mere defense to liability. Whitaker v. Garcetti, ___ F.3d ___, 2007 WL 1366069 (9th Cir., May 10, 2007). When an individual sues a government official for violation of a constitutional right, the official is entitled to qualified immunity unless (1) the facts alleged, viewed in the light most favorable to the individual asserting the injury, show that the official violated a constitutional right, and (2) the contours of the right were sufficiently clear so that a reasonable official would understand that his conduct violated that right. Saucier v. Katz, 533 U.S. 194, 201-202 (2001).

The standard for determining qualified immunity is objective. First, courts must consider "whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002) (citing Saucier, 533 U.S. at 201). If such a violation occurred, courts must then ask "'whether the right was clearly established . . . in light of the specific context of the case' such that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1129 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 201).

The pivotal question here is whether the law is clearly established. For the law to be "clearly established," "[t]he contours of the right" must be sufficiently clear that a reasonable official would understand that his conduct violates that right. Anderson, 483 U.S. at 640. It is not necessary that the "very action in question has previously been held unlawful, . . . but it is to say that in light of preexisting law the unlawfulness must be apparent" to the official. Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

Where the United States Supreme Court and numerous federal

circuit courts, including the Ninth Circuit, "fear to tread" into the issue of whether a college student as a property right in continued enrollment (see Hill v. Board of Trustees of Michigan State Univ., 182 F.Supp.2d 621, 628 (W.D. Mich. 2001)), the right to due process with respect to that "right" cannot be said to be clearly established.  It is not clearly established in this state or in this circuit.  Accordingly, this court will recommend that summary judgment be granted on Count One of the complaint on qualified immunity grounds.

**B.   Remaining Counts**

The remaining counts are based solely on state law.  The question thus arises whether the court should continue to exercise its supplemental jurisdiction over the remaining claims, pursuant to 28 U.S.C. § 1367.  In Imagineering, Inc. v. Kiewit Pacific Co., 976 F.2d 1303, 1309 (9th Cir. 1992), the Ninth Circuit wrote:

> Section 1367(c)(3) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if-the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367.  The exercise of pendent jurisdiction to hear state claims is within the discretion of the federal district court. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).  Nevertheless, in dictum the Court in *Gibbs* stated that "if the federal claims are dismissed before trial ... the state claims should be dismissed as well." *Id.*

This case is in its preliminary stages.  Discovery was stayed pending a ruling on the pending motion for summary judgment.

Accordingly, it will be recommended that the remaining state claims be dismissed without prejudice.

## V. CONCLUSION

Based on the foregoing,

**IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment (Court's Doc. No. 114) be GRANTED as to Count One of Plaintiff's Complaint.

**IT IS FURTHER RECOMMENDED** that all remaining counts be dismissed without prejudice.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel within ten (10) days after receipt hereof, or objection is waived.

DATED this 21st day of May, 2007.

Carolyn S. Ostby
United States Magistrate Judge